No. 104,485

STATE OF KANSAS, *Appellee*, v. JOSE SANTOS-VEGA, *Appellant*.

(321 P.3d 1)

Opinion filed March 21, 2014.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellant.

*Mollie R. Hill*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Jose Santos-Vega appeals his convictions for aggravated indecent liberties with a child and the corresponding hard 25 life sentences imposed under Jessica's Law, K.S.A. 21-4643. He raises six issues: (1) whether alternative means existed for his aggravated indecent liberties charges; (2) whether the district court erred in failing to give a unanimity jury instruction; (3) whether the district court erred in denying a mistrial after a law enforcement officer violated an order in limine by volunteering that Santos-Vega invoked his postarrest right to remain silent and describing the circumstances of that invocation; (4) whether cumulative error denied Santos-Vega a fair trial; (5) whether his hard 25 life sentences are disproportionate in violation of § 9 of the Kansas Constitution Bill of Rights; and (6) whether the lifetime postrelease

supervision and electronic monitoring portions of his sentences are illegal.

We reverse Santos-Vega's convictions and remand his case to the district court for a new trial. We hold the cumulative impact of the failure to give a unanimity instruction in this multiple acts case and the detective's violation of an order in limine, which implicated Santos-Vega's constitutional right to remain silent and violated his right to due process, substantially prejudiced his right to a fair trial. As the party benefitting from both trial errors, the State failed to prove beyond a reasonable doubt that these errors did not contribute to the guilty verdicts. We do not reach the sentencing issues.

### FACTUAL AND PROCEDURAL BACKGROUND

The State charged Santos-Vega with four sex offenses involving two children who occasionally stayed at the home where Santos-Vega was living during the summer of 2008. A jury acquitted him of two counts of rape of 15-year-old S.S., but convicted him of two counts of aggravated indecent liberties with a child under K.S.A. 21-3504(a)(3)(A) as to 11-year-old S.T. We focus on the allegations involving S.T. because of those convictions.

Santos-Vega lived with his girlfriend, LaT'isha Stone, in the Kansas City, Kansas, home of her mother and her mother's boyfriend, who was S.T.'s father. S.T. came to stay with her father for about a month around the Fourth of July in 2008.

On March 16, 2009, S.S. reported to police that Santos-Vega had raped her repeatedly during June 2008 while S.S. was staying at the home. During the course of investigating those claims, S.S. said S.T. had told her and the other occupants of the house that Santos-Vega was touching S.T. in an inappropriate manner. S.T. was referred to Sunflower House, a children's advocacy center in the Kansas City metropolitan area, where she was interviewed.

A video recording of S.T.'s Sunflower House interview was played for the jury. In it, S.T. said she stayed with her dad for about a month around July 4, 2008. She acknowledged she was at Sunflower House to talk about Santos-Vega touching her in the "wrong spot." She said this touching happened three times.

The first time, she said, occurred while she was asleep facing the back of a living room couch when Santos-Vega woke her up, put his hand under her pants and panties, and touched her with the palm of his hand on her "hoo hoo," which she later identified on a diagram as her vagina. She said she knew it was Santos-Vega because she recognized his voice telling her to wake up. She guessed the touch lasted 5 minutes. She said she told Santos-Vega to stop, but he continued until she slapped him on the face and he went into Stone's bedroom. S.T. said she thought this happened about 6 a.m., but was not sure. When Santos-Vega left, she said she thought she got up to go to the bathroom and then went outside to jump on the trampoline.

The second incident, S.T. said, happened the next day and occurred the same way as the first. She said the third incident happened the day after the second and was also the same. She said she believed all incidents took place around 6 a.m. and that another child, 7-year-old U.H., was also sleeping in the living room when the incidents occurred.

S.T. said she told Stone what happened 4 or 5 days after the last incident and that Stone made her tell her dad, Stone's mother, and S.S. as a group. When asked what her dad did in response, she guessed that he had called and told someone to arrange the Sunflower House interview.

At trial, S.T. testified Santos-Vega touched her on her "hoo hoo" with his hand, under her clothes. She could not recall what, if anything, he was doing with his hand. She said Santos-Vega was standing in front of her when she woke, did not say anything, and touched her for about 3 seconds. She said she then slapped him twice. The second incident happened the next day, when S.T. said the same thing happened. The third happened the day after that, and was the same, except it ended when S.T. got up to use the restroom. S.T. said the third incident was the last.

On cross-examination, S.T. said she told her family the first and third incidents might have happened at 6 a.m. and the second might have happened at 11 p.m. She said she did not see Santos-Vega but recognized his voice. She then admitted Santos-Vega probably did not say anything.

The other witnesses' testimony about what S.T. had told them varied. Stone testified S.T. told her Santos-Vega touched her on the upper leg but could not remember where Santos-Vega touched her when her father asked. S.T.'s father testified that S.T. had said Santos-Vega touched her above the thigh, below the belly button, but above the genitals. Stone also testified that she had a dog that would scratch and cry if anyone got up in the night, implying that Santos-Vega could not have left their room without her knowing about it.

Santos-Vega testified and denied sexually molesting or touching either child or doing anything inappropriate to them. He said he worked as a painter during the summer of 2008, got up around 6:15 a.m., started work around 6:30 or 7 a.m., returning home around 5 p.m. or later. He said Stone's mother usually got up around 6 a.m. to feed her cats. He said Stone was always with him when he was at home, except when he was in the backyard with S.T.'s dad. He said he always woke Stone up when he got up out of their bed and would tell Stone if he got up at night. He emphasized there was never a time when he got up at night without letting Stone know where he was going or what he was doing.

U.H., the 7-year-old who also stayed at the home that summer, testified as a defense witness. She said she slept on the living room floor next to where S.T. slept on the couch. U.H. said she never saw anything odd going on with S.T. and never saw or heard anyone come into the room while she was sleeping there. On cross-examination by the State, U.H. admitted she was a somewhat heavy sleeper.

Additional facts specific to the unanimity instruction and the mistrial motion are discussed in the analysis.

The jury returned guilty verdicts on the two aggravated indecent liberties charges involving S.T. The district court sentenced Santos-Vega to concurrent hard 25 life sentences. Santos-Vega timely appealed. Jurisdiction is appropriate under K.S.A. 22-3601(b)(1) (life imprisonment, off-grid crime; appeal docketed prior to July 1, 2011).

## ALTERNATIVE MEANS

Santos-Vega argues first that K.S.A. 21-3504(a)(3)(A) sets out

alternative means of committing aggravated indecent liberties with a child based on its requirement that the offender specifically intend "to arouse or to satisfy the sexual desires of either the child or the offender, or both." This argument is without merit.

Since Santos-Vega filed his appeal, this court has consistently held that the phrase referring to arousing or satisfying the sexual desires of "either the child or the offender, or both" does not create alternative means of committing aggravated indecent liberties with a child. *State v. Newcomb*, 296 Kan. 1012, 1015-16, 298 P.3d 285 (2013); *State v. Britt*, 295 Kan. 1018, 1025-26, 287 P.3d 905 (2012); *State v. Brown*, 295 Kan. 181, 201-02, 284 P.3d 977 (2012). At oral argument, Santos-Vega's counsel conceded this issue has been resolved against his client.

## UNANIMOUS JURY VERDICT

Santos-Vega next argues his right to a unanimous jury verdict was violated because the district court failed to give a unanimity instruction; *i.e.*, the jury was not told to unanimously agree upon the specific act underlying each of his two convictions. He notes the State charged him with two identically worded counts of aggravated indecent liberties with a child, but S.T. testified about three incidents, each occurring on a different day.

In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. *State v. Foster*, 290 Kan. 696, 712, 233 P.3d 265 (2010); *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). This creates the potential for uncertainty as to whether the jury unanimously agreed upon any particular act to convict on each specific charge. See *State v. Voyles*, 284 Kan. 239, 248, 160 P.3d 794 (2007).

The State agrees it presented a multiple acts case and did not inform the jury which act to rely on for each charge. Because of that, the State concedes the district court erred by not instructing the jury to unanimously agree on the specific act underlying each conviction. But the State attempts to salvage these convictions by arguing the omission was not clear error requiring reversal. Santos-Vega acknowledges he did not request a unanimity instruction.

*Standard of Review*

A defendant has a right to a unanimous jury verdict. See K.S.A. 22-3421; K.S.A. 22-3423(1)(d); *Foster*, 290 Kan. at 712. When a violation of this right is asserted, an appellate court must determine first whether it is presented with a multiple acts case. This is a question of law over which the appellate court exercises unlimited review. *Voyles*, 284 Kan. at 244. If the case is a multiple acts case, the appellate court must then determine whether error was committed because either the State must have informed the jury which act to rely upon for each charge during its deliberations or the district court must have instructed the jury to agree on the specific criminal act for each charge in order to convict. The failure to elect or instruct is error. See 284 Kan. at 244-45. When there is error, the final question is whether the error warrants reversal or was harmless. The test for harmlessness when a unanimity instruction was not requested or its absence not objected to is the clearly erroneous standard articulated in K.S.A. 22-3414(3). 284 Kan. at 252-53. In other words, an appellate court must be firmly convinced that under the facts the jury would have returned a different verdict if the unanimity instruction had been given. See *State v. King*, 297 Kan. 955, 979-80, 305 P.3d 641 (2013); see also *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (noting court's decision to omit the "real possibility" language from *Voyles* test to avoid confusion with the constitutional harmless error test).

*Discussion*

The parties correctly recognize error occurred because the State did not inform the jury which act to rely upon in its deliberations to convict Santos-Vega on each count of aggravated indecent liberties and the district court failed to give a unanimity instruction. These failures are particularly noteworthy in this case because during its deliberations the jury actually questioned why Santos-Vega was charged with two offenses when the testimony showed S.T. was fondled three distinct times. Inexplicably, the district court simply referred the jury back to the original written instructions without addressing the jury's actual inquiry. The jury's question should have triggered recognition that a multiple acts problem pre-

sented itself and that a unanimity instruction was an appropriate response, which would have had no adverse consequences on review. These circumstances leave us with the only remaining question whether there was clear error as defined in our caselaw.

In *Voyles*, the failure to give a unanimity instruction was not harmless and amounted to clear error under the facts of that case. 284 Kan. at 255. The defendant was convicted of four counts of aggravated criminal sodomy and four counts of aggravated indecent solicitation—two of each offense for each of the two victims. The problem was that the evidence yielded "a number of factually separate incidents . . . from which the jury could have found [defendant] guilty of aggravated criminal sodomy and/or aggravated indecent solicitation of a child." 284 Kan. at 253. The court noted at least 20 separate acts could be inferred from the victims' differing accounts to support the convictions on the 8 charged offenses. This was because the victims' and other witnesses' trial testimonies were inconsistent as to when, where, and how many times incidents occurred over a several month period. 284 Kan. at 253-54.

The failure to give a unanimity instruction in *Voyles* was clear error because the jury had several incidents from which to choose—in part because of inconsistent victim testimony—in convicting defendant on each count. Accordingly, the court could not ascertain whether the jury believed the aggravated solicitation counts related to each victim were based on the same fact episodes as the aggravated sodomy counts. 284 Kan. at 253-54.

But the court reached a different result in *Foster*, holding that the failure to give a unanimity instruction was harmless, *i.e.*, it did not amount to clear error. 290 Kan. at 716. In *Foster*, the victim testified the defendant raped her twice, but the defendant was charged with only one count of rape. Foster's defense was a general denial. On appeal, Foster argued *Voyles* mandated reversal because the victim gave different accounts of the crime, not providing all the details until her final statement to police.

The *Foster* court rejected this argument because the victim's trial testimony was consistent with her police statement and there were never any significant contradictions from any other version of the events given by the victim. The court distinguished *Voyles*,

noting that the inconsistent statements at issue in that case specifically dealt with the dates, times, locations, and other relevant details to the "separate-but-distinct issue in the multiple acts analysis." 290 Kan. at 716. In contrast, the court explained: "The [*Foster*] jury did not have to pick among contradicting accounts from differing victim[s'] statements to piece together the elements of the offense charged in order to find [the defendant] committed rape." 290 Kan. at 716. In addition, there was other evidence in *Foster* such as truck stop receipts and DNA that supported the victim's testimony and refuted Foster's alibi.

Reasonable people might differ in assessing whether the unanimity error in this case requires reversal. The facts supporting the aggravated indecent liberties charges against Santos-Vega lie somewhere between the circumstances described in *Foster* and *Voyles*. For example, S.T.'s Sunflower House interview was consistent with her trial testimony as to where and how many times the incidents occurred and the general manner in which they were perpetrated. But the testimony of other occupants of the house, including S.T.'s father, about what S.T. had told them had happened added important variations to her version of events. And unlike *Foster*, there was no physical evidence to corroborate S.T.'s testimony or refute Santos-Vega's general denial. Finally, we have the jury itself expressing some bewilderment with the lack of alignment between the three incidents described and the two counts charged against the defendant, which should have prompted the trial court to take some remedial step. See *State v. Wade*, 295 Kan. 916, 922, 287 P.3d 237 (2012) (commenting about the "common prophylaxis" of repeating already given PIK instructions as answers to jury questions and observing that "[o]ne might ponder how obvious it would be to a lay juror that the judge would answer the jury's legal question with definitions that had absolutely nothing to do with the question").

In the end, it is unnecessary to reach a conclusion whether this unanimity error standing alone is enough to firmly convince this court the jury would have returned a different verdict if the proper election had been made by the State or a unanimity instruction had been given. As we discuss next, a second error of substantial

magnitude combines with the unanimity error to compel reversal for a new trial.

### DENIAL OF THE MOTION FOR MISTRIAL

Santos-Vega argues next that the district court erred when it denied his motion for a mistrial after a detective, who was called as a State's witness, violated an order in limine and *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), by testifying that Santos-Vega invoked his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). Santos-Vega contends this violated his constitutional rights. Additional facts are necessary to put this claim into context.

*Additional Facts*

Prior to trial, the district court granted Santos-Vega's request for an order in limine prohibiting the State, its witnesses, and others acting on its behalf from "presenting any evidence, statement, or insinuation" concerning "any comment, reference, or insinuation that [Santos-Vega] did not cooperate with the investigation of the charges while exercising his constitutional rights to remain silent and seek the assistance of counsel."

As part of its case-in-chief, the State called detective John Hudson, who had investigated the charges against Santos-Vega. During cross-examination by defense counsel, Hudson described a probable cause affidavit he had prepared, when the following exchange occurred:

"Q. Okay. And this affidavit, Detective Hudson, was prepared *with what information that you had in your possession at the time?*

"A. I had the information based on the statements, based on the allegations made by the—by [S.T.] and [S.S.], and which time it was forwarded. *Your client refused to give me a statement, so I didn't have his version of the events. He was given an opportunity to, he asked for an attorney and so he invoked his rights, so I did not get his version of the events. He was explained his charges, what was going on. He got this look in his eye and he sunk his head down like—and he said I want an attorney.*" (Emphasis added.)

Santos-Vega's attorney promptly asked to approach the bench and moved for a mistrial, arguing the detective not only violated

the pretrial order in limine, but also made "a negative inference with regard to my client exercising his constitutional right to remain silent in this matter." Counsel characterized this testimony as unsolicited, volunteered, and highly prejudicial.

The State responded that the detective's testimony was responsive to defense counsel's open-ended question and contended further that defense counsel should have controlled the witness better and "cut him off" if the answer drifted away from what had been asked. The district judge ruled:

"Well, I understand. The response probably expanded upon what you were looking for, but, when you're getting into the affidavit, you know, you're asking him what information he had at the time it was prepared, and so—I mean I'm—

. . . .

" . . . You can get into that he had a constitutional right to remain silent and so forth, but you've also represented to the jury that [Santos-Vega]'s going to take the stand, and so he will give his explanation at that time, so at this point I'm denying the motion for a mistrial. Let's move on."

After this ruling, Santos-Vega's attorney resumed cross-examination, during which he initiated two more exchanges with the detective at different points in the questioning about Santos-Vega's *Miranda* invocation. The detective testified the invocation was noted in the affidavit; that the detective believed all citizens enjoy the right to consult attorneys before divulging information to the police; and admitted the detective did not hold the invocation against Santos-Vega.

The State did not reference the *Miranda* invocation during the remainder of the trial, and neither counsel requested a special instruction or admonition. The district court did not give a special instruction or admonition or take any remedial action on its own to minimize the detective's statements.

After his convictions, Santos-Vega moved for a new trial due in part to the detective's revelation of and characterizations about the *Miranda* invocation. He argued the statements violated the order in limine and prejudiced Santos-Vega before the jury. The district judge denied the motion based on its earlier ruling during trial, adding, "[I] don't see anything at this point which would cause me to review that and come to a different conclusion."

*Standard of Review*

A district court may declare a mistrial if prejudicial conduct, in or outside the courtroom, makes it impossible to proceed without injustice to the defendant or the prosecution. See K.S.A. 22-3423(1)(c). When a district court evaluates a mistrial motion it employs a two-step process. First, it determines if there was a fundamental failure in the proceeding. If so, it next determines if it is possible to continue without injustice by examining whether the damaging affect can be removed by admonition, jury instruction, or other action. If not, the court must determine whether the degree of prejudice results in an injustice; and if so, it should then declare a mistrial. *State v. McCullough*, 293 Kan. 970, 980, 270 P.3d 1142 (2012) (citing *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]).

On appeal, the district court's disposition of the motion is reviewed for abuse of discretion. *McCullough*, 293 Kan. at 980-81. Abuse of discretion occurs when judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. The reviewing court also follows a two-step process to determine whether the district court abused its discretion in determining if there was a fundamental failure in the proceeding and whether it abused its discretion in deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in injustice. 293 Kan. at 980-81 (citing *Ward*, 292 Kan. at 550-51).

To determine whether an error makes it impossible to proceed with the trial without injustice and requires a mistrial, a court must assess whether the fundamental failure affected a party's substantial rights under the harmless error statutes, K.S.A. 60-261 and K.S.A. 60-2105, if a right guaranteed by the United States Constitution is not implicated; but if a constitutional right is implicated,

the error must be assessed under the constitutional harmless error standard in *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). See *Ward,* 292 Kan. at 569.

Under either scenario, the test is whether the error affected substantial rights, meaning whether the error affected the trial's outcome. If the fundamental failure infringes upon a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error standard defined in *Chapman,* in which case the error may be declared harmless when the party benefitting from the error proves beyond a reasonable doubt the error will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* when there is no reasonable possibility the error contributed to the verdict. *Ward,* 292 Kan. at 569. An appellate court uses the same analysis to review the trial court's determination regarding harmless error. *Ward,* 292 Kan. at 570.

*Discussion*

We have no hesitancy in concluding the district court abused its discretion in its handling of the motion for mistrial. The district court's ruling was based on erroneous conclusions of both fact and law.

At least implicitly, the district court's inactions suggest it found the detective's answer was responsive to defense counsel's question, but that was obviously wrong. The detective was asked only what information he had to prepare the affidavit. He answered instead by explaining what information he did not have and then embellishing on that nonresponsive reply by explaining why he did not have more information, *i.e.,* Santos-Vega "invoked his rights" by refusing to give a statement and asking for an attorney. Even more egregiously, the detective colorfully described how Santos-Vega "got this look in his eye and he sunk his head down . . . and . . . said I want an attorney." None of this was called for by the simple question from counsel about what information the detective had in his possession in preparing the affidavit.

A similar scenario was faced in *State v. Gadelkarim,* 256 Kan. 671, 887 P.2d 88 (1994), *disapproved on other grounds by State v.*

*Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). In *Gadelkarim*, defense counsel was questioning a police officer about his report and asked if the officer "had determined the defendant could not be interviewed after his arrest," and the witness said the defendant "invoked *Miranda*." 256 Kan. at 684. On appeal, the defendant argued this testimony violated his due process rights. The court noted the invited error rule, but performed a harmless error analysis after observing that "the invited error rule cannot be used as a pretext for the violation of a defendant's constitutional rights where there is no justification for so doing." 256 Kan. at 685.

Intrinsically, violations of orders in limine have a prejudicial effect because the requisite for obtaining such orders is showing that the mere offer or reference to the excluded evidence would tend to be prejudicial. The primary purpose of an order in limine, after all, is to prevent prejudice during trial. See *State v. Crume*, 271 Kan. 87, 100-01, 22 P.3d 1057 (2001) (describing nature and purpose of motions/orders in limine): *State v. Galloway*, 268 Kan. 682, 690, 1 P.3d 844 (2000) ("The purpose of an order in limine is to exclude inadmissible evidence from trial, recognizing that the mere offer of inadmissible evidence at trial can prejudice the jury."); see also *State v. Sanders*, 263 Kan. 317, 323, 949 P.2d 1084 (1997) (noting police testimony that defendant terminated interrogation arguably barred by order in limine—was "possibly improper," but concluding defendant failed to demonstrate degree of prejudice necessary for reversal); *State v. Massey*, 242 Kan. 252, 265, 747 P.2d 802 (1987) (holding nonresponsive police testimony in violation of order in limine prejudicial and determining whether, despite violation, it was possible to proceed without injustice to defendant).

The importance of compliance with orders in limine has been underscored by our caselaw imposing a duty on prosecutors to instruct their witnesses about the existence and contents of such orders as a guard against improper testimony. See *State v. Kidd*, 293 Kan. 591, 598, 265 P.3d 1165 (2011) (considering prosecutorial misconduct when prosecutor conceded he failed to instruct witness about order in limine); *State v. Wittsell*, 275 Kan. 442, 454, 66 P.3d 831 (2003) (when court issues order in limine, prosecutor has duty

to inform State's witnesses of order and any subjects improper for testimony); *Crume*, 271 Kan. at 101 (even absent a limiting order, prosecutor has duty to guard against statements made by State's witnesses containing inadmissible evidence).

Beyond this, the detective's testimony implicated Santos-Vega's rights under the United States Constitution. The use of a defendant's postarrest, post-*Miranda* silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Doyle*, 426 U.S. at 619; see *Gadelkarim*, 256 Kan. at 685 ("It is well established that it is constitutionally impermissible for the State to elicit evidence at trial of an accused's silence at the time of arrest and after the accused has received the *Miranda* warnings."); *cf. Miranda*, 384 U.S. at 444-45. The detective's testimony clearly imbued the defendant with guilt as he described how Santos-Vega "got this look in his eye, and he sunk his head down like—and he said I want an attorney."

The detective's comments are a textbook example of evidence the State may not use against a defendant under *Doyle*. The detective established in just a few sentences that Santos-Vega invoked his *Miranda* rights to remain silent and have an attorney present immediately after the charges were explained to him. See *Doyle*, 426 U.S. at 619; *State v. Tully*, 293 Kan. 176, 186-87, 262 P.3d 314 (2011). Both the United States Supreme Court and this court have emphasized the importance of respecting the protections of *Doyle* because "every post-arrest silence is insolubly ambiguous." *Doyle*, 426 U.S. at 617; see *Tully*, 293 Kan. at 192-93.

We hold that the district court abused its discretion in failing to treat the detective's volunteered and nonresponsive testimony as a fundamental failure in the trial proceedings. Santos-Vega's rights as protected by *Miranda* and *Doyle* were violated.

We must consider next whether this error was harmless to the degree of certainty applicable to constitutional errors, as defined in *Chapman*. To do so, we examine the error in the context of the record as a whole, considering how the district court dealt with the error as it arose, including any remedial efforts. *Ward*, 292 Kan. at 569-70. In this respect, the district court's response to the motion for mistrial was to suggest that defense counsel dive deeper

with the detective into the subject of Santos-Vega's *Miranda* invocation, which arguably would have compounded the problem rather than minimized it. The district court gave no admonition or curative instruction to the jury.

In *Tully*, this court considered the defendant's claim that the State violated his rights under *Miranda* and *Doyle* when it attempted, while cross-examining him, to impeach his credibility by referencing his postarrest silence. The verdict against the defendant hinged upon whether the jury believed the defendant's or the victim's testimony about whether intercourse between the two was consensual. After holding the cross-examination violated *Miranda* and *Doyle*, we noted such violations necessarily impact defendants' credibility. See 293 Kan. at 193-94. And because credibility was outcome-determinative, "any error that impacted Tully's credibility had a reasonable possibility of contributing to the verdict and [could not] be declared harmless." 293 Kan. at 194.

In Santos-Vega's case, we are faced with a very similar circumstance in that the guilty verdicts had to depend on who the jury believed—S.T. or Santos-Vega. There is no physical evidence to add weight to the State's case. And it is not beyond reason that the jury rejected Santos-Vega's denial that any wrongdoing occurred based on nothing more than the detective's improper embellishments as to how Santos-Vega "got this look in his eye and he sunk his head down . . . and . . . said I want an attorney" when he was told of the charges against him and invoked his constitutional rights. But because the detective's testimony was not the only defect in Santos-Vega's trial, we need not rest our decision on this error alone.

## CUMULATIVE ERROR

Cumulative trial errors, when considered collectively, may have so great an impact on the trial as to require a defendant's convictions to be reversed. The test is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial under the totality of the circumstances. See *Tully*, 293 Kan. at 205-06, 207. And if any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a rea-

sonable doubt. In conducting this analysis, an appellate court examines the errors in the context of the record as a whole, considering: (1) how the district court dealt with the errors as they arose, including the efficacy, or lack of efficacy, of any remedial efforts; (2) the nature and number of errors committed and their interrelationship, if any; and (3) the strength of the evidence. See 293 Kan. at 205-06 (citing *Ward*, 292 Kan. at 569-70, 577). No prejudicial error may be found if the evidence is overwhelming against the defendant. *Tully*, 293 Kan. at 206 (citing *State v. Colston*, 290 Kan. 952, Syl. ¶ 15, 235 P.3d 1234 [2010]).

We hold Santos-Vega was denied a fair trial in this credibility contest by the aggregate impact of the *Doyle* violation, complete with the detective's histrionic emphasis, and the lack of unanimity between the evidence and the charges being deliberated, which remained unexplained despite the jury's obvious confusion. The State has not established beyond a reasonable doubt that the combined effect of these errors did not affect the jury's verdicts. Given this outcome, we need not consider the remaining issues relating to sentencing.

Judgment of the district court is reversed, and the matter is remanded to the district court for a new trial.