NOT DESIGNATED FOR PUBLICATION

No. 118,482

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TODD A. JONES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed December 14, 2018. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Laura L. Miser*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON and GARDNER, JJ.

PER CURIAM:  Todd A. Jones appeals his conviction following a jury trial, arguing (1) the State failed to present sufficient evidence to support his aggravated indecent liberties with a child conviction; (2) the district court committed clear error in failing to give a unanimity jury instruction; and (3) the State withheld exculpatory or impeachment evidence from the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On December 15, 2016, K.D., who was 14 years old at the time, lived with her family in an apartment complex in Emporia, Kansas. On that date, she was home with her younger brothers and decided to visit her grandma alone at her apartment across the street. K.D. was on the sidewalk outside the apartment building when Jones asked her if she would help him move boxes in his apartment.

K.D. knew Jones as her upstairs neighbor and had been to his apartment a couple of times. On Halloween, K.D. went to Jones' apartment with her brother, and Jones gave her a king-size box of candy, gave her brother full-size candy bars, and took a picture of them on his phone. A few days before Jones asked K.D. for help, K.D. had asked if Jones would help her unlock a phone she bought at school. Jones agreed to help, so K.D. left the phone with him. K.D. explained that while she was not entirely comfortable asking Jones for help, she asked him, in part, because he and his brother stated they knew how to hack into phones. K.D. admitted she could not ask the seller to unlock the phone because the phone was stolen and she could not get her parents' help because she had misbehaved and was not supposed to have a phone.

After K.D. agreed to help Jones move boxes, they went to his apartment and he closed the door behind her. K.D. went into the living room; Jones asked K.D. to take a seat, so she sat down on his couch. Jones offered K.D. some pie and a soda. K.D. declined his offers of food and drink, then Jones sat down next to K.D. and started to touch her inappropriately. K.D. testified Jones leaned onto her and eventually put himself on top of her, with one leg on her side and one leg in between her legs. K.D. stated that Jones touched her boobs over her shirt, rubbed her thigh, and made comments like, "These are nice." K.D. could not recall any other comments Jones made. Jones touched and kissed her neck and cheek, and Jones placed his hand on her neck and did not choke her but squeezed it. At one point, Jones shoved his mouth onto K.D.'s mouth and put his

2

tongue into her mouth; K.D. stated he tasted like cigarettes. Jones also pulled down his pants and put his privates or penis on K.D.'s thigh on top of her pants. K.D. did not look but she felt him pressing against her; his private felt hard, and K.D. stated he continued touching her boobs. Jones tried to touch K.D.'s privates and tugged at her pant waistband, but she kept pushing him away. K.D. stated that she froze, could not do anything, and did not want to look at Jones, so she stared at the television.

Jones stopped after K.D. started crying and told him her parents would be home soon and her brothers needed her. K.D. stood up, and Jones got off her. K.D. started walking towards the door and Jones sort of blocked her, but she moved past him, left Jones' apartment, and returned to her apartment downstairs. K.D. went to the bathroom and threw up. K.D. initially testified she made her brothers go to their room and she called her aunt and told her what happened. K.D. later stated that she called her grandma first to get her aunt's phone number so her aunt could help her with homework because K.D. did not want her grandma to know. K.D. stated her grandma provided her with the aunt's phone number then came over to the apartment to ask K.D. what was wrong, but K.D. did not tell her grandma what happened. K.D.'s grandma testified that K.D. called her that night and asked her to have her aunt call her so she could help K.D. with homework.

The aunt testified that she has a close relationship with K.D. She called the family's house phone after her mother called her saying K.D. wanted to talk to her. The aunt lived in Burlington, Kansas, and described K.D.'s voice during the call as teary and shaky. The aunt continued questioning K.D. to figure out what was wrong, and K.D. eventually told her aunt that she went to help someone move boxes and that someone tried to touch her or was grabbing her. The aunt said her roommate overheard the conversation and called a friend who worked for the Emporia Police Department. While the aunt was speaking with K.D., K.D.'s grandma showed up at K.D.'s apartment. The aunt then drove to Emporia.

While K.D. was waiting for her aunt, the police arrived at K.D.'s apartment. K.D. testified she eventually told the police some of what happened. Emporia Police Officer Gabrielle Withington testified that she interviewed K.D. two times that night and described K.D. as crying and pacing around the kitchen. Withington admitted K.D. first described the events in less detail; however, Withington did not ask K.D. questions during the initial interview. Initially, K.D. told Withington that Jones pushed her down, climbed on top of her, and was kissing her all over the left side of her face. K.D. stated Jones put his tongue inside her mouth, was rubbing his penis on her leg, and was massaging her throat. K.D. gave a second statement about an hour later, during which Withington asked K.D. questions. Withington described K.D.'s statements to her during the second interview, which were generally consistent with K.D.'s later testimony at trial.

After talking to police, K.D. went to a Topeka hospital with her mother and her aunt. At the hospital, K.D. told Sexual Assault Nurse Examiner (SANE) Jennifer Harris some of what happened. K.D. told Harris that Jones told her to sit down and offered to add more pop to her 2-liter bottle. K.D. did not give the bottle to him because she was scared he would put something in it. Harris testified that K.D. told her Jones sat on top of her and started kissing and touching her mouth and neck, and he put his tongue into her mouth. Jones kept trying to pull off K.D.'s shirt and touched her breasts over her clothing but never touched skin. Jones attempted to pull down her pants, pulled down his pants, and rubbed her leg with his penis on top of her pants. K.D. did not look at Jones' penis but stated she could feel it on her thigh. K.D. also told Harris that Jones had his hand near her trachea and she did not want to do anything because she was scared he would murder her. Based on K.D.'s statements, Harris took DNA swabs from K.D.'s neck and around the outside and inside of her mouth. Harris collected K.D.'s clothing and inspected her pants with a blacklight but saw no bodily fluids. Harris stated the blacklight would not show bodily fluids if the fluids were dry.

4

During Emporia Police Detective David Holmes' interview with Jones, Holmes obtained two oral swabs from Jones that were sent to the Kansas Bureau of Investigation (KBI) for testing. Holmes stated he saw a pie on the counter and soda in the refrigerator in Jones' apartment. Holmes did not take K.D.'s phone into evidence—the phone K.D. purchased was inside Jones' apartment—but he did take pictures of it. Holmes obtained a search warrant for Jones' phone and recovered the picture Jones took on Halloween.

The next day, Michelle Colyer of the Kansas Department for Children and Families conducted a forensic interview of K.D. During the interview, K.D. told Colyer about the phone she had bought that her parents did not know about, but K.D. would not say who sold her the phone. K.D. said she had taken the phone up to Jones to have him activate it a few days before because he had a similar phone. K.D. thought Jones was going to give her the phone back, but she did not ask him about the phone when she went up to his apartment the night of the incident.

The State charged Jones with aggravated indecent liberties with a child more than 14 years but less than 16 years of age and criminal restraint. KBI forensic scientist Rachel White testified at trial that she analyzed all the DNA swabs taken from K.D.'s neck, mouth, and oral cavity and that the swabs matched K.D.'s DNA profile. However, while K.D.'s oral swab contained some male DNA, the value was too small for testing purposes, and the quality of the mouth swab sample did not allow her to draw any conclusions. As for the neck swab, White identified two male donors in the sample and separated the donors into a major and minor contributor, because one person was more present than the other. White concluded that she could not exclude Jones as a contributor because his DNA male haplotype was consistent with a partial minor male haplotype developed for comparison purposes. White explained the probability of selecting an unrelated male in the general population with the partial minor male DNA haplotype was 1 in 442 individuals.

Jones testified in his defense. Jones had moved from Colorado that August to start a new job. He did not spend a lot of time at his apartment, had interacted some with K.D.'s family, and knew all the families who lived in his building. Jones' brother had stayed with him between September and Thanksgiving and may have had more interactions with K.D.'s family.

On Halloween, Jones' brother went to the store and had bought too much candy. Jones gave K.D. a box of Whoppers and his neighbor's child a box of Hot Tamales; he also gave out handfuls of candy to all the kids to get rid of it. Jones explained he took a picture of K.D. and her brother because he thought the costumes were neat and to show his Central American coworkers—who were curious about Halloween—the costumes. Jones testified K.D. came up to him in the parking lot as he exited his car one time before Thanksgiving and grabbed his arm because she wanted to see his iPhone 7.

Jones testified that on the evening of December 15, 2016, he was smoking a cigarette and reviewing a work project on his phone outside on the apartment landing. K.D. came up and asked him if he had an iPhone charger. Jones went into his apartment, grabbed his charger and gave it to K.D., and she left. Shortly after, Jones went inside his apartment and, about five minutes later, he heard a knock at the door. Jones testified K.D. told him she could not get the phone to work. Jones had made an apple pie and had some soda, and he thought it polite to offer K.D. some. Jones looked at K.D.'s phone and tried to unlock it for about five minutes. During that process, Jones stated he and K.D. grabbed the phone back and forth from each other, and K.D. sat on the opposite side of the sofa from him. Jones described K.D. as extremely anxious and worried about her parents. After his attempts to unlock the phone, Jones told K.D. he could see if someone at work could help, and K.D. left the phone with him. Jones stated he did not know the phone was stolen at that time.

After K.D. left, Jones went outside to smoke a cigarette and noticed a parked police vehicle. Jones stated that his next memory was an officer knocking on his door, and the police would not tell him what was going on. Jones became aware there was an investigation when Holmes approached him, but he testified he was in shock that night and could not recall his interactions with the police or giving a DNA sample.

Jones testified that the police requested he go to the police station. He complied and stated the questioning lasted about 20 minutes. Holmes told him there was a surveillance system at the apartment complex, and Jones stated, "Good." Jones said he would be glad that the interaction with K.D. was caught on camera because it would show she came up to him twice and he never asked her to move boxes. Later, Jones learned that no system existed. Jones denied kissing, licking, rubbing, or making any sexual contact with K.D. Jones also admitted that before that night, neither he nor K.D. had any reason to be mad at the other.

The jury acquitted Jones of criminal restraint but found him guilty of aggravated indecent liberties with a child. The district court sentenced Jones to a term of 41 months in prison and lifetime postrelease supervision.

Jones timely appeals.

I.  DID THE STATE PRESENT INSUFFICIENT EVIDENCE TO SUPPORT JONES' AGGRAVATED INDECENT LIBERTIES CONVICTION?

Jones first argues that the State failed to present sufficient evidence to support his conviction for aggravated indecent liberties with a child.

> "'When the sufficiency of the evidence is challenged in a criminal case, this court
> reviews the evidence in a light most favorable to the State to determine whether a rational

7

fact-finder could have found the defendant guilty beyond a reasonable doubt. In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.' An appellate court will reverse a guilty verdict even if the record contains some evidence supporting guilt only in rare cases when the court determines that evidence was so incredulous no reasonable fact-finder could find guilt beyond a reasonable doubt. [Citations omitted.]" *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018).

Under K.S.A. 2017 Supp. 21-5506(b)(2)(A), aggravated indecent liberties with a child occurs when the child is more than 14 but less than 16 years of age and the defendant engages in "[a]ny lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both."

To prove Jones guilty, the State needed to establish that (1) Jones lewdly fondled or touched K.D. without her consent; (2) Jones intended the lewd fondling or touching to arouse or satisfy sexual desires of either himself, K.D., or both; (3) K.D. was more than 14 but less than 16 years of age; and (4) the conduct took place in Lyon County, Kansas, on or about December 15, 2016.

Our Supreme Court has explained that

"a touch is prohibited if it meets the common meaning of the term 'lewd,' *i.e.*, if the touch is sexually unchaste or licentious; suggestive of or tending to moral looseness; inciting to sensual desire or imagination; or indecent, obscene, or salacious. In considering if a touch is lewd, a factfinder should consider whether the touch tends to undermine the morals of a child and is so clearly offensive as to outrage the moral senses of a reasonable person." *State v. Reed*, 300 Kan. 494, Syl. ¶ 1, 332 P.3d 172 (2014), *cert. denied* 135 S. Ct. 1566 (2015).

"Whether a touching is lewd depends upon the totality of the circumstances and is a question for the jury. Accordingly, whether the action offends the moral senses of a reasonable person is a determination left to the jury. [Citations omitted.]" *State v. Rutherford*, 39 Kan. App. 2d 767, 776, 184 P.3d 959, *rev. denied* 286 Kan. 1184 (2008).

Our review of the record shows the State presented sufficient evidence to support Jones' conviction for aggravated indecent liberties with a child. K.D. testified she was 14 years old on December 15, 2016, and the State placed into evidence K.D.'s prior statements to investigators that Jones either sat down next to K.D. or sat down on top of her. K.D. testified that Jones sat down next to her and placed himself on top of her. K.D. described Jones as touching her boobs over her shirt and rubbing her thighs; attempting to touch her boobs under her shirt and pulling down her pants; and making comments to her such as "These are nice." K.D. also stated Jones kissed and licked her on the neck and cheek and, at one point, pulled her mouth towards his and put his tongue into her mouth. K.D. said that Jones pulled down his pants and pressed his privates or penis on her thigh.

Jones argues we should find the State presented insufficient evidence to support his conviction based on the inconsistencies in K.D.'s statements, her inconsistent behavior and statements about Jones, her conduct in regards to the stolen phone, and the State's lack of DNA evidence. But with these arguments, Jones asks us to reweigh the evidence, resolve evidentiary disputes, and make witness credibility determinations, which is something we cannot do. See *Torres*, 308 Kan. at 488.

The jury heard all the evidence, including K.D.'s prior statements and testimony, Jones' testimony, and the DNA evidence. Jones described his interactions with K.D. differently than K.D. and denied making sexual contact with her. K.D., however, described Jones' conduct at trial in a generally consistent manner with her statements to police, the SANE nurse, and the forensic interviewer. Although some of K.D.'s statements and testimony were inconsistent, the jury, as the fact-finder, weighed the

9

evidence, resolved evidentiary disputes, and made witness credibility determinations. In reviewing the evidence in the light most favorable to the State, we conclude that sufficient evidence supports Jones' aggravated indecent liberties with a child conviction.

## II. DID THE DISTRICT COURT COMMIT CLEAR ERROR IN FAILING TO GIVE A UNANIMITY JURY INSTRUCTION?

Jones argues the district court erred by failing to give a unanimity jury instruction but acknowledges that he requested no such jury instruction before or at trial.

> "'Where an instruction was not requested during the trial, an appellate court applies a clearly erroneous standard of review.' Whether the failure to give a unanimity instruction in a multiple acts case is clearly erroneous involves a de novo review of the entire record. 'Whereas the burden to show harmlessness generally shifts to the party benefitted by the error, the burden to show clear error under K.S.A. 22-3414(3) remains on the defendant.' [Citations omitted.]" *State v.* [*Chris*] *King*, 299 Kan. 372, 379, 323 P.3d 1277 (2014).

However, Jones argues instead that we should review the reversibility of any instructional error under the harmlessness standard because the district court's failure to instruct the jury on unanimity violated his constitutional rights. Although Jones acknowledges he raises his constitutional claims for the first time on appeal, he nevertheless argues we should review his claim to serve the ends of justice or prevent a denial of his fundamental rights. In response, the State argues that under *State v. Williams*, 295 Kan. 506, 510-17, 286 P.3d 195 (2012), we should not allow Jones to avoid the clear error standard by presenting a constitutional claim for the first time on appeal.

Generally, a theory not raised before the district court, even a constitutional issue, cannot be raised for the first time on appeal. There are recognized exceptions to the general rule, including when the "consideration of the theory is necessary to serve the

ends of justice or to prevent the denial of fundamental rights." *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34) requires a party to explain why an issue not raised below should be considered for the first time on appeal.

But Jones presents no authority in support of his argument that the constitutional harmlessness standard applies despite his lack of a contemporaneous objection. When an appellant either fails to support an argument with pertinent authority or explain why the argument is sound in the face of contrary authority, that appellant fails to properly brief that argument, which is akin to abandonment. See *State v. Tague*, 296 Kan. 993, Syl. ¶ 3, 298 P.3d 273 (2013). In *Williams*, our Supreme Court explained that "characterizing the issue as a constitutional claim does not significantly advance [a defendant's] procedural posture. Even constitutional grounds for reversal are not properly before the appellate court for review if they are being asserted for the first time on appeal." 295 Kan. at 517. Moreover, our Supreme Court has held: "The failure to give a jury instruction is reviewed for clear error unless the issue is properly preserved." *State v. Brammer*, 301 Kan. 333, 339, 343 P.3d 75 (2015); see also K.S.A. 2017 Supp. 22-3414(3) (clear error standard applies if defendant fails to object to giving of or failure to give instruction). For these reasons, we will review Jones' claim that the district court improperly failed to give a unanimity jury instruction for clear error.

Under Kansas law, a defendant is entitled to a unanimous jury verdict. K.S.A. 22-3421; *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014). When a case involves multiple acts and any one of the acts could constitute the crime charged, the jury must be unanimous in finding which specific act constitutes the crime. See *State v. De La Torre*, 300 Kan. 591, 595, 331 P.3d 815 (2014). To ensure jury unanimity in multiple acts cases, the State must elect which act it is relying upon for the charge or the district court must instruct the jury that it must unanimously agree on the specific act constituting the crime charged. *State v. Akins*, 298 Kan. 592, 618, 315 P.3d 868 (2014). However, this court has

11

held the State need not elect a specific act and the district court need not give a unanimity jury instruction "when 'the acts at issue occur in a series over a very short time and form parts of a whole.'" *State v. Rivera*, 42 Kan. App. 2d 1005, 1018, 219 P.3d 1231 (2009) (quoting Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 301 [2005]), *rev. denied* 290 Kan. 1102 (2010).

We apply a three-part test to analyze multiple acts cases. The first part of the test requires us to decide whether the case involves multiple acts or a unified course of conduct. See *State v.* [*Kameron*] *King*, 297 Kan. 955, 979, 305 P.3d 641 (2013). Resolving this issue presents a question of law over which we exercise unlimited review. See *Santos-Vega*, 299 Kan. at 18. Should we find the defendant's conduct unitary, then the analysis ends. See *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007).

When reviewing the first step,

"the threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. This court has determined that acts are multiple acts if they are factually separate and distinct. And incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a later criminal act is motivated by a 'fresh impulse.' Factually separate and distinct incidents are not what this court calls 'unitary conduct.' The factors we have used to determine the existence of unitary conduct are: "'(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct."' [Citations omitted.]" [*Chris*] *King*, 299 Kan. at 379.

The State charged Jones with aggravated indecent liberties with a child more than 14 but less than 16 years of age. Jones acknowledges the State presented evidence that he allegedly engaged in lewd fondling and touching of K.D. at the same location and within

12

a short time period. But Jones argues the case involves multiple acts based on the different alleged acts and the evidence supporting each act.

Contrary to Jones' argument, his acts were not separate and distinct; rather, his acts were causally related. No intervening events or fresh impulses interrupted Jones' acts. K.D.'s testimony described one incident with Jones that took place on December 15, 2016, inside Jones' apartment when K.D. was 14 years old:  Jones sat down next to her, placed himself on top of her, and touched her inappropriately. After Jones began the inappropriate touching, K.D. froze and did not or could not do anything, and Jones only stopped when she started crying and told him she needed to leave. Thus, the evidence shows Jones engaged in a series of acts over a short period of time which formed parts of the whole.

Because Jones did not commit multiple acts, the unanimity jury instruction he claims should have been given was not necessary. Accordingly, the district court did not err in failing to give a unanimity jury instruction.

III.    DID THE STATE COMMIT A *BRADY* VIOLATION?

Jones argues for the first time on appeal that the State violated his rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose exculpatory and impeachment evidence before trial that the phone K.D. asked Jones to help her activate was stolen.

Generally, we review a district court's decision regarding a *Brady* violation de novo and give deference to the district court's findings of fact. *State v. DeWeese*, 305 Kan. 699, 709, 387 P.3d 809 (2017).

"In *Brady v. Maryland*, the United States Supreme Court held: '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. So prosecutors have a positive duty to disclose evidence favorable to the accused—which encompasses both exculpatory and impeachment evidence.

"This court requires three essential elements to establish a *Brady* violation: '"(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice."' [Citations omitted.]" 305 Kan at 710.

A "reasonable probability" test applies to the materiality element, meaning "'[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' [Citations omitted.]" 305 Kan. at 710.

Jones acknowledges he did not raise his *Brady* violation argument below, but he argues we should consider his claim for the first time on appeal to serve the ends of justice or to prevent the denial of a fundamental right. See *Phillips*, 299 Kan. at 493. Other panels of this court have found that this exception may apply to *Brady* violations raised for the first time on appeal. See *State v. Mead*, No. 115,989, 2017 WL 4082240, at *8-9 (Kan. App. 2017) (unpublished opinion) (finding defendant could have asserted denial of important right exception); *State v. Nelson*, No. 104,070, 2012 WL 1919859, at *14 (Kan. App. 2012) (unpublished opinion) (applying to argument based on motion for new trial proceedings raising *Brady* violation for first time on appeal). But even when faced with a potential denial of a defendant's fundamental rights, as here, we may decline to consider the issue if the record is insufficient to address the merits. See, e.g., *State v. Ortega-Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 (2008).

14

Without venturing into the thicket of whether this issue has been properly preserved and assuming without deciding that Jones has established the first two prongs of the test showing a *Brady* violation, our review of the record fails to establish the materiality element. The record shows the jury was aware that K.D.'s phone was stolen when it reached its verdict. K.D. admitted the phone was stolen during cross-examination. Jones testified he did not know that the phone was stolen at the time he agreed to help K.D. Jones also testified he and K.D. had no reason to be mad at each other before that night. Finally, defense counsel argued in closing that K.D. may have accused Jones because he could not get her stolen phone to work. The State addressed the defense's argument on rebuttal and argued the jury could also reasonably infer the opposite finding from the evidence, i.e., K.D. would not accuse or discredit Jones because he agreed to help her get the phone to work. The jury was presented with the fact the phone was stolen and the parties argued about its effect at the trial. Accordingly, Jones cannot meet the materiality element necessary to establish a *Brady* violation.

Affirmed.