IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,038

STATE OF KANSAS,
*Appellee*,

v.

SHERRICK A. SIMS,
*Appellant*.

SYLLABUS BY THE COURT

1.

On the facts of this case, the district court did not abuse its discretion in denying a mistrial when State witnesses made three brief, cryptic references to material prohibited by orders in limine, the judge recognized the errors, and the judge issued a curative admonition in one instance and moved the trial immediately to other topics in the second and third instances.

2.

A district court is not required to instruct a jury to consider a lesser included homicide offense simultaneously with any greater homicide offense, overruling *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003).

3.

Even if evidence in a stipulation to a prior felony conviction is subject to K.S.A. 2017 Supp. 60-455 and its requirement that a district judge give a limiting instruction, the failure to give such an instruction in this case was not clear error.

1

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed November 30, 2018. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Ethan Zipf-Sigler*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Defendant Sherrick Sims appeals from his convictions for premeditated first-degree murder and criminal possession of a firearm in the shooting of Jose Raul Alarcon-Quintana at a gathering in Alarcon-Quintana's garage. Sims was sentenced to life in prison for the murder and a concurrent 18 months for the firearm conviction.

Sims challenges the denial of his motion for mistrial, the sequential ordering of the jury instructions for the degrees of homicide, and the failure to give a limiting instruction to accompany his stipulation to a prior felony conviction. Sims also argues that, even if the errors mentioned above are not reversible standing alone, their cumulative effect requires reversal.

We hold the district court did not abuse its discretion when it denied Sims' motion for mistrial; the jury instructions were legally correct; and the failure to give a limiting instruction was not clearly erroneous. As a result, we affirm Sims' convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of June 9, 2013, Alarcon-Quintana hosted a small gathering at his home. A group of six friends spent the evening talking and drinking beer in the garage. Later in the evening, Sims and his girlfriend, Kimberly Carrillo, stopped by Carrillo's mother's house, which was across the street from Alarcon-Quintana's house. Sims, who was an acquaintance of Alarcon-Quintana's, took his infant child along to the garage party while Carrillo took their other children to her mother's house.

At some point, Alarcon-Quintana and Sims made a trip to the liquor store. Sims purchased a bottle of vodka, and—as he put it—drank "pretty much" the whole thing. At trial, witnesses would recall that Sims and Alarcon-Quintana seemed to be on friendly terms.

Later that evening, after several of the guests had left, two men who knew Sims arrived. Sims walked outside with them, away from the remaining partygoers. Sims would testify that they had stepped away to discuss "personal business." Carrillo left her mother's house and got into the van she and Sims had arrived in with their children. She would testify that Sims had told her to wait in the van for a minute.

When Sims and the two men returned to the party, Sims approached Alarcon-Quintana, who was sitting on a chair inside the garage between his friends, Efrain Campos and Julio Rivas. Sims walked up to Alarcon-Quintana, and the two men stood close behind him. Sims asked Alarcon-Quintana for money. Alarcon-Quintana took out his wallet and handed Sims a one-hundred-dollar bill. Sims responded, "[N]o money, no money." Alarcon-Quintana was silent and remained seated. What happened next would be disputed at trial.

3

Campos and Rivas would testify that one of the men standing behind Sims handed him a gun. Rivas said Sims lowered his hand for the gun, then cocked it and pointed it at Alarcon-Quintana. Sims then shot Alarcon-Quintana in the face. Campos and Rivas would recall hearing two or three shots fired. Campos said Sims then just turned and walked away "like normal." Sims left with his girlfriend in one vehicle, and the two men left in another vehicle.

Sims would admit at trial that he shot Alarcon-Quintana, but he claimed he did so in self-defense. After telling Alarcon-Quintana, "[N]o money, no money," Alarcon-Quintana reached into his pocket for what Sims believed to be a gun. One of the men standing behind Sims "pushed" a gun into Sims' hand, and he fired.

Responding officers found Alarcon-Quintana slumped over in a lawn chair with blood running down his face and onto the ground. Nothing indicated a struggle had occurred. Only one bullet had hit Alarcon-Quintana, and only one shell casing was found.

The State charged Sims with first-degree premeditated murder and criminal possession of a firearm. The State also charged Sims with the misdemeanor battery of Gelber Garcia, which, it alleged, Sims had committed the same day.

Before trial, Sims filed a motion in limine asking to prohibit introduction of certain evidence. It read:

> "2. The [S]tate should be prohibited from introducing testimony or evidence of a history of the procurement of drugs or prostitutes by the defendant for the decedent as testimony by witnesses regarding this is immaterial to the charges and are not a part of the State's theory in this case.

4

"3. The State should be prohibited from introducing evidence relating to a rifle as mentioned in the statement of [Nicholas] Treat. This evidence is not material to the State's theory [in] this case and there is no evidence of a rifle being used in the shooting of the victim in this case."

Nicholas Treat was a friend of Sims; Sims stayed with Treat on and off between the time of the shooting and Sims' arrest. At a hearing the district judge granted Sims' motion, without objection from the State.

At trial, after the conclusion of voir dire, the court and counsel discussed additional evidentiary issues. The State informed the court that Garcia had died and asked to dismiss the battery count. The judge allowed dismissal. Sims' counsel asked for "some kind of limiting motion" to prevent any witness from mentioning the battery. The State assured the court that it had "instructed the witnesses that they cannot—if they don't know what happened, they cannot say—I believe the witnesses will say that they saw the defendant leave for a short period of time and then came back, but they don't know what he was doing at that time." After noting that a battery jury instruction proposed earlier would now be omitted, the judge confirmed that it "sounds like [the State] has already indicated to [its] witnesses that there should be no testimony about this alleged fracas between Mr. Sims and Mr. Garcia."

At three points during the testimony of State witnesses, Sims' counsel objected to testimony as violating orders in limine. When Campos was testifying about what happened after Sims and Alarcon-Quintana returned from the liquor store, he said:

5

"They started talking, and I'm not sure how my friend was talking to [Sims], because he spoke Spanish, but my friend, he didn't speak much English and there was some deal where they were going to go, um, beat up someone who supposedly had stolen a chain from my friend Jose."

Defense counsel objected, asked to approach the bench, and told the judge that the reference to beating someone up "obviously . . . violates the order in limine." Defense counsel then asked for a mistrial. The district judge denied the motion for mistrial and admonished the jury:

"Ladies and gentlemen of the jury, I am going to ask you to disregard the last statement that was made as far as any conversation that was had between the victim and Mr. Sims. That's not relevant to what was happening as far as this trial is concerned, so just don't let that enter into your process of deliberation when the case is submitted to you."

The court then excused the jury for a break and told counsel, "I think in this one particular instance we can cure it with an admonition, but in the future we need to make sure that all of the witnesses understand."

The second objection occurred during Treat's testimony. Treat testified that Sims called him the day after the shooting, needing a place to stay. When Treat asked what was going on, Sims replied, "[N]othing, man. Shit just got real bad." When Treat pressed Sims for details, Sims said he had shot a man twice in the chest the day before over money the man owed him. Sims told Treat he would have shot others who were present too, but his gun jammed and one of his friends dragged him out. Treat said, "Yeah, he told me he got the guy twice and that it was all over some money the guy owed him over a fight. He put a hit on somebody—" Defense counsel again objected:

6

"Your Honor, I think there's been another violation of the order in limine. Mr. Treat is now volunteering yeah, I think it was a fight over some money that was owed over—I think he was getting ready to say or did say something about a hit or a job of some kind like that. . . . [T]hat's the second time. I don't know what the Court heard, but that's what I heard."

Although there was some confusion among the court and counsel over exactly what the witness had said, all agreed that the State should not pursue that line of questioning further. Defense counsel did not request a mistrial or an admonition to the jury at that point.

After Treat's testimony concluded, outside the presence of the jury, defense counsel reiterated his objection. Both defense counsel and Sims believed the witness had used the word "hit," and the judge checked the record and confirmed this was correct. Defense counsel then renewed his motion for mistrial. The judge again overruled the motion, explaining:

"The record is clear about what was said. I think in the context of the testimony, the testimony by Mr. Treat revolves more around . . . the statements that were made by Mr. Sims and about the shooting of the victim in this case, certainly the readback would indicate that the word hit was used. I'm not sure that the jury will understand within what context it was used.

"I will note for the record this is the second request for a mistrial by Mr. Sims in the case so the record is clear about it. However, the Court does not find that it's overly prejudicial to Mr. Sims at this point and will overrule the motion."

The third of three defense objections based on orders in limine occurred during the testimony of Detective Clayton Bye. The State asked Bye what Treat had told detectives. Bye began, "He gave us a statement. He said that he saw Mr. Sims with a rifle in the—,"

7

but the State cut Bye off before he could finish his sentence. Sims' counsel approached the bench, objected to the testimony, emphasized that the testimony constituted a third violation of the motion in limine, and renewed his motion for mistrial. The judge again overruled the motion because he did not think the testimony was prejudicial to Sims. But the judge warned the State that "it doesn't go any further" and asked the State to "move on to something else right away." The State agreed, and the trial resumed.

At the end of the State's case-in-chief, defense counsel again renewed his motion for mistrial based on the violations of the orders in limine. The court responded:

"As to the issue of mistrial, it is troubling to the Court that we've been through this three times, but I will note the following: I've had an opportunity last night to review the applicable statute, which is K.S.A. [22-]3423 and also to review what the Court feels is probably the leading case on a violation of a motion in limine, which is *State v. Copridge* [260 Kan. 19, 918 P.2d 1247 (1996)].

"The mistrial can be declared by statute for a number of reasons . . . .

"The Court does not find that any of those apply except for C, which would be the prejudicial conduct in or outside of the courtroom. . . .

. . . .

"[*Copridge*] indicates that the Court needs to make a two-part determination, the first part being whether or not the motion in limine was violated. If the motion in limine was violated, does it prejudice the defendant's right to a fair trial? Certainly the motion in limine[,] as we've discussed[,] talked about we weren't going to discuss [during] trial the fact that Mr. Sims had allegedly been hired to go beat someone up[;] secondly the hit, in this Court's mind, relates to the going to be beat up.

8

"There's not specific language in the motion in limine, nor do I know how Mr. Sims could have anticipated that word being used here, and the third incident of the rifle is one that was specifically addressed in the motion in limine that Mr. Sims filed. The Court didn't find that any one of those incidents standing alone . . . should result in a mistrial in this particular case.

"However, it's the Court's belief that that does not end the analysis. Is there enough cumulative mention in these motions in limine[] to deny a fair trial to Mr. Sims?

"The Court specifically finds that there have been violations of the motion in limine, and at least on two of those occasions and arguably certainly on three, and the two that are obvious to the Court is the mention by Campos of the hiring or being sent out to beat someone up, the second being the rifle that was mentioned by . . . Detective Bye today. The hit is a comment that certainly I think relates to what it was that the victim asked . . . Mr. Sims . . . to go out and do, and so if I had to resolve that one way or the other I would resolve it as being a violation of the motion in limine.

"Now, returning to the analysis of do those three things prejudice Mr. Sims' right to a fair trial in this case? The Court finds that the mention of the actions of Mr. Sims in leaving the party, the reference to a hit, which were comments made by Mr. Sims to Mr. Treat, and finally the brief mention of a rifle by Detective Bye in this case, when the three are combined, they do not rise to the level of creating prejudice to Mr. Sims in the case, so I will deny your motion for mistrial for those reasons."

Sims was the only witness who testified in the defense case. He said he had known Alarcon-Quintana for a few months. On the night of the shooting, his intention was to "[s]it and drink and chill until Kimberly and the kids were ready." Sometime later, Sims' cousin Lee and another man named Jonas arrived. Sims, Lee, and Jonas left the party for a few minutes and then returned.

9

According to Sims, he approached Alarcon-Quintana and asked him for money Alarcon-Quintana owed him. Alarcon-Quintana took a hundred-dollar bill out of his wallet and pushed it toward Sims. Sims responded, "[M]y friend, no money, no money." Sims explained, "[A]t this point when he's pulling out the hundred dollars, it's like dude, you owe me more than a hundred dollars so if you're going to give me some money I might as well wait to get it all at once." Sims said the tension escalated and Alarcon-Quintana then reached into a different pocket. When defense counsel asked what happened next, Sims said, "And a gun was pushed into my hand and I fired the gun."

Sims testified that he believed Alarcon-Quintana had a weapon because he had helped him get a gun a couple of weeks earlier. Sims insisted that he had not asked anyone for a gun and did not know who had put the gun in his hand. Defense counsel asked, "And once this gun was in your hand, what did you do?" Sims responded, "I lifted my hand and fired it." Sims said he did not aim the gun but heard it go off two or three times. Defense counsel asked what went through Sims' mind when the gun fired, and Sims said he thought, "Oh fuck, oh shit, what the hell? It was like fuck." He described the shot as "instantaneous from the time [the gun] hit my hand because I thought he had a weapon."

Sims also said he initially thought the shots had missed Alarcon-Quintana. After the shooting, Lee grabbed the gun from Sims' hand, and, Sims said, he left in a car with Lee and Jonas.

The district judge instructed Sims' jury that it could find Sims guilty of first-degree murder, guilty of a lesser included crime, or not guilty. The judge instructed on the lesser included crimes of intentional second-degree murder, reckless second-degree murder, and voluntary manslaughter. In addition, the judge instructed the jury on self-defense.

10

The voluntary manslaughter instruction was predicated on a theory that the killing was "done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person." The jury was told to consider voluntary manslaughter "[i]f you do not agree that the defendant is guilty of reckless murder in the second degree." The jury also was told not to consider reckless second-degree murder unless its members did not agree on intentional second-degree murder. And, in turn, it could not reach intentional second-degree murder unless jurors could not agree on first-degree premeditated murder. In short, the jury's consideration of the charged crimes and the possible lesser included crimes was structured in descending order of severity.

The charge of criminal possession of a firearm required the State to prove that Sims had been convicted of a felony within the previous 10 years. Sims stipulated to his prior felony conviction, and the jury was instructed as follows:

"The following facts have been agreed to by the parties and are to be considered by you as true:

"1. That the defendant, Sherrick A. Sims was convicted of a felony offense in Wyandotte County District Court within the ten years preceding June 9, 2013.

"2. That the defendant was prohibited [] from owning or possessing a firearm on June 9, 2013.

"3. That the defendant has not had the prior conviction expunged or been pardoned for such crime.

"4. That the defendant was not found to be in possession of a firearm at the time of the commission of the preceding felony."

11

No party sought, and the district judge did not provide, a K.S.A. 60-455 limiting instruction on the uses to which the jury could put the stipulated evidence of Sims' prior conviction.

The jury convicted Sims of first-degree premeditated murder and criminal possession of a firearm. The district judge denied Sims' later motion for a new trial based on the violations of the order in limine, and he sentenced Sims to life in prison with a mandatory minimum of 25 years for first-degree premeditated murder and a concurrent 18 months for criminal possession of a firearm.

MISTRIAL

In his first issue on appeal, Sims argues that the district judge erred by not granting a mistrial.

A district court's authority to grant a mistrial is dictated by K.S.A. 22-3423. A district judge "may terminate the trial and order a mistrial at any time that he [or she] finds termination is necessary because . . . [p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(c).

> """This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011).

12

""""In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551." *Waller*, 299 Kan. at 725-26.' *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015)." *State v. Sean*, 306 Kan. 963, 987-88, 399 P.3d 168 (2017).

A court abuses its discretion when its action is

"(1) arbitrary, fanciful, or unreasonable, *i.e.,* if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.,* if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.,* if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Santos-Vega*, 299 Kan. 11, 23, 321 P.3d 1 (2014).

In its brief, the State argues that Campos' and Treat's testimony did not violate the order in limine. According to the State, "the defendant cannot present a single reference to the record" that shows an order in limine prohibiting testimony about the circumstances giving rise to the debt owed by Alarcon-Quintana to Sims.

The State is correct that the original motion in limine did not explicitly cover evidence of the alleged "hit" that Alarcon-Quintana asked Sims to perform. But, at that time, Sims was still facing a charge of misdemeanor battery for allegedly carrying out Alarcon-Quintana's request. That changed at the conclusion of voir dire, when the battery charge was dropped.

After dismissal of that charge, Sims' defense counsel asked for an additional order limiting testimony about the battery. Although the district judge did not explicitly grant the request, there was no need. The State had agreed that it would not introduce evidence about the battery and that witnesses would limit their testimony to the fact that Sims had left the party for a while and then returned.

Under these circumstances, we detect no abuse of discretion in the district judge's ruling that the testimony from Campos and Treat violated his orders. A trial court is generally in the best position to decide whether such a violation has occurred. See *State v. Breedlove*, 295 Kan. 481, 494, 286 P.3d 1123 (2012). Here, not only did the judge believe his orders had been violated, but also both parties acted as though they had been violated.

We next turn to the district judge's conclusion that the three violations of the limine orders did not prejudice Sims either individually or cumulatively.

As Sims noted in his brief, we have previously said,

> "Intrinsically, violations of orders in limine have a prejudicial effect because the requisite for obtaining such orders is showing that the mere offer or reference to the excluded evidence would tend to be prejudicial. The primary purpose of an order in limine, after all, is to prevent prejudice during trial." *Santos-Vega*, 299 Kan. at 25.

But every violation of an order in limine does not require a mistrial. Prejudice may be slight or amenable to cure when viewed in context.

In this case, each violation was an unprompted response to a question by the State that defense counsel immediately objected to. Testimony stopped before each witness could further elaborate on the prohibited subject. The district judge issued a curative

admonition after the first instance. See *State v. Robinson*, 303 Kan. 11, 246, 363 P.3d 875 (2015) (where trial court admonishes jury to disregard objectionable testimony, reversal not required unless remarks so prejudicial as to be incurable). He decided the best course of action in the two other instances was to avoid focusing the jury's attention on the erroneous references.

In the context of this case, we cannot say no reasonable person would have reached the same conclusion as the district judge. The witnesses' violations were minimal and cryptic, and the evidence against Sims was strong. There was no question that Sims killed Alarcon-Quintana; the only question was whether he acted in self-defense when he did so. The brief references by the State's witnesses about the "hit" and the rifle were not pivotal facts in the case that altered its outcome. See *Santos-Vega*, 299 Kan. at 23; see also *State v. Crume*, 271 Kan. 87, 98-102, 22 P.3d 1057 (2001) (affirming denial of mistrial motion; three violations of order in limine precluding prior-crimes testimony; court admonished jury; evidence against defendant strong); *State v. Aikins*, 261 Kan. 346, 377, 932 P.2d 408 (1997) (affirming denial of mistrial motion; violation of order in limine precluding gang-affiliation testimony minimal; evidence against defendant strong), *disapproved of on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012); cf. *State v. Massey*, 242 Kan. 252, 262-65, 747 P.2d 802 (1987) (reversing denial of mistrial motion; violation of order in limine precluding testimony about pivotal fact—whether hole in bedspread covering murder victim caused by bullet). Although the district judge recognized three limine violations, he did not err by refusing to grant a mistrial.

ORDERING LANGUAGE IN INSTRUCTIONS

Next, Sims challenges instructions that told the jury how to order its consideration of the degrees of homicide. The instructions listed the lesser included offenses of

15

premeditated murder in descending order of severity. Each lesser-included offense instruction stated that "[i]f you do not agree that the defendant is guilty of [greater offense], you should then consider [lesser offense]." Again, the voluntary manslaughter instruction stated, "If you do not agree that the defendant is guilty of reckless murder in the second degree, you should then consider the lesser included offense of voluntary manslaughter."

Sims claims the instructions were legally erroneous because they did not permit the jury to consider imperfect self-defense voluntary manslaughter contemporaneously with premeditated first-degree murder and intentional second-degree murder. Voluntary manslaughter is a lesser included offense of both crimes. See, e.g., *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008). Put simply, an intentional killing is elevated to first-degree murder if it is accompanied by premeditation; it is reduced to voluntary manslaughter if it is accompanied by an unreasonable but honest belief that deadly force is justified.

Sims points us to *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003), which held that a jury must be instructed to consider intentional second-degree murder and voluntary manslaughter simultaneously. *Graham*, 275 Kan. at 836-37. He acknowledges that *State v. Bell*, 280 Kan. 358, 121 P.3d 972 (2005), and its progeny held a district court need not instruct a jury to consider premeditated murder and imperfect self-defense voluntary manslaughter simultaneously because "the two are mutually exclusive concepts" but asks us to overrule them. 280 Kan. at 367; see *State v. Lawrence*, 281 Kan. 1081, 1092-93, 135 P.3d 1211 (2006), and *State v. Carter*, 284 Kan. 312, 326, 160 P.3d 457 (2007) (affirming *Bell*).

16

Sims concedes that he did not object to the ordering language at trial; we therefore apply a clearly erroneous standard on appellate review. See K.S.A. 2017 Supp. 22-3414(3). This court first determines "whether the instructions were legally and factually appropriate, employing an unlimited review of the entire record. If error is found, 'the defendant must firmly convince the court the jury would have reached a different result without the error.' [Citations omitted.]" *State v. Brown*, 306 Kan. 1145, 1164, 401 P.3d 611 (2017).

In *Graham*, the defendant claimed the jury instruction on attempted voluntary manslaughter based on heat of passion was clearly erroneous because it prevented the jury from considering that crime simultaneously with attempted second-degree murder. The challenged instruction said: "'If you do not find the defendant is guilty of attempted second-degree murder, you should then consider the lesser included offense of attempted voluntary manslaughter.'" 275 Kan. at 840. We agreed with the defendant and held:

> "This 'reordering' deprived the jury of the opportunity to consider the mitigating circumstances of heat of passion or sudden quarrel which reduce an intentional homicide from murder to voluntary manslaughter. Both second degree-murder and voluntary manslaughter are intentional killings. An intentional homicide is reduced from murder to voluntary manslaughter if it is committed upon a sudden quarrel or in the heat of passion under K.S.A. 21-3403(a). Where the homicide is intentional and there is some evidence the homicide was committed under the mitigating circumstances contained in K.S.A. 21-3403(a), the appropriate voluntary manslaughter instruction should be considered by the jury during its consideration of second-degree intentional murder. Thus, where there is evidence of mitigating circumstances justifying an instruction on voluntary manslaughter in a case where voluntary manslaughter is a lesser included offense, a failure to instruct the jury to consider such circumstances in its determination of whether the defendant is guilty of second-degree murder, is always error—and in most cases—presents a case of clear error." *Graham*, 275 Kan. at 836-37.

17

Later, the *Bell* court distinguished the *Graham* rule from cases involving premeditation. 280 Kan. at 365-67. In *Bell*, the defendant argued that the district court should have instructed the jury to consider first-degree premeditated murder and voluntary manslaughter simultaneously. Bell's jury had been instructed on both heat of passion and imperfect self-defense theories of voluntary manslaughter.

At the outset, the *Bell* court affirmed that premeditated murder cannot be reduced to voluntary manslaughter committed in the heat of passion because premeditation and heat of passion are mutually exclusive concepts. 280 Kan. at 366; see *State v. Hurt*, 278 Kan. 676, 683, 101 P.3d 1249 (2004). Then the court extended this rationale to imperfect self-defense:

> "[P]remeditated first-degree murder would not be reduced by an honest but unreasonable reliance on self-defense because, as with premeditation and heat of passion, the two are mutually exclusive concepts. If a murder were committed with premeditation, it would not be the result of an unreasonable but honest belief that circumstances justified deadly force. Premeditation requires reason; imperfect self-defense requires the absence of reason." *Bell*, 280 Kan. at 367.

Accordingly, *Bell* held that a district court is not required to instruct a jury to consider the offenses of premeditated murder and voluntary manslaughter simultaneously. 280 Kan. at 367.

In essence, Sims asks us to remove the *Bell* exception to *Graham*'s simultaneous consideration rule. He insists that a logical fallacy pollutes *Bell* because "the *Bell* Court conflated the idea of having a reason or motive to act (i.e. premeditation) with the concept of acting reasonably" and an "[u]nreasonable reliance on the belief in the need

18

for self-defense is still a motive and can still constitute premeditation." He asks us to apply the *Graham* rule instead, suggesting it is grounded in due process.

We agree that *Bell*'s mutual exclusivity test is problematic. Because in truth, every lesser included offense is "mutually exclusive" of its primary offense—a person cannot be convicted of both a primary charged offense and its lesser included offense. K.S.A. 2012 Supp. 21-5109(b) ("Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both."); *State v. Hensley*, 298 Kan. 422, 436, 313 P.3d 814 (2013) ("[B]oth K.S.A. 21-3107 [now K.S.A. 2017 Supp. 21-5109] and the Double Jeopardy Clauses require reversal of both the conviction and sentence if the legislature did not intend multiple punishments."); see U.S. Const. amend. V; Kan. Const. Bill of Rights, § 10. The two are *always* mutually exclusive.

But *Bell* is not the only problem. In hindsight, we discern flaws in the simultaneous consideration rule itself. Specifically, we cannot locate any statutory or constitutional foundation for the rule.

The *Graham* court relied on *State v. Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001), as its sole authority for the simultaneous consideration rule. In fact, we incorporated *Cribbs*' analysis into our opinion. *Graham*, 275 Kan. at 836-39. As the *Graham* court noted, *Cribbs* was, at that time, "the only other Kansas appellate decision dealing with the precise question" of whether it was clearly erroneous to fail to instruct a jury to consider the crimes of attempted second-degree murder and attempted voluntary manslaughter sequentially. 275 Kan. at 836.

In *Cribbs*, the defendant challenged the following instruction: "If you do not agree that the defendant is guilty of the crime of an attempt to commit the crime of murder in the second degree, you should then consider the lesser included offense of an

19

attempt to commit the crime of voluntary manslaughter.'" 29 Kan. App. 2d at 922. The *Cribbs* panel held this instruction was erroneous because:

> "In essence, Cribbs' jury was told that it need not bother considering attempted voluntary manslaughter unless and until it failed to agree on his guilt of attempted second-degree murder. It may never have fully analyzed whether the shooting was the product of heat of passion or a sudden quarrel, the factors that distinguish the greater and the lesser crimes and the reasons they require simultaneous deliberation when the evidence could support either." 29 Kan. App. 2d at 924.

Thus, *Cribbs* did not anchor its holding to any statutory or constitutional text—it simply required simultaneous consideration. Though Sims suggests due process demands simultaneous consideration, we have never declared this to be the case. Indeed, while a smattering of jurisdictions have imposed similar simultaneous consideration rules, and while some have held sequential jury instructions resulted in due process violations, we can locate no decision from any court suggesting the simultaneous consideration rule is required by due process. See *Falconer v. Lane*, 905 F.2d 1129, 1136 (7th Cir. 1990) (holding sequential structure of jury instructions, which encouraged jurors to "answer [murder instruction's] requirements first and then move on [to voluntary manslaughter] only if those requirements [could not] be met" violated defendant's due process rights); *Fincham v. State*, 427 S.W.3d 643, 648 (Ark. 2013) ("We are convinced that, as to the lesser-included offense of extreme-emotional-disturbance manslaughter, [the challenged instruction] does not accurately state the law because it instructs the jury to consider manslaughter only if it has reasonable doubt as to the greater offense. Instead, the jury should have been instructed to consider manslaughter after it found [defendant] guilty of murder. . . . [T]his error prevented the jury from considering the lesser included offense of manslaughter, thereby depriving [defendant] of due process."); *Edge v. State*, 261 Ga. 865, 867, 414 S.E.2d 463 (1992) ("A sequential charge requiring the jury to consider voluntary manslaughter *only* if they have considered and found the defendant not guilty

20

of malice murder and felony murder is not appropriate where there is evidence that would authorize a charge on voluntary manslaughter."); *State v. Coyle*, 119 N.J. 194, 223-24, 574 A.2d 951 (1990) ("In murder cases in which there is evidence of passion/provocation . . . a sequential charge coupled with an instruction that inadequately defines the elements of the greater offense, namely, murder, can mislead the jury."); but see *State v. Jones*, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *16 (Tenn. Crim. App. 2011) (unpublished opinion) (sequential jury instructions do not violate due process).

Thus, ours is a judicially created rule. This rule has, in subsequent years, created ample confusion, leading to decisions like *Bell*. Furthermore, the practical considerations involved in mandating simultaneous consideration by a jury of lesser included offenses weigh against the rule. How is a jury to make sense of the various possible crimes without a sequential structure? The kind of sequential instructions contemplated by our pattern instructions eliminate the confusion and difficulty that will surely ensue when a jury is instructed to simultaneously consider first-degree murder and every lesser included offense at the same time.

In sum, our simultaneous consideration rule is a judicial innovation that has proved confusing and unworkable. Unless and until we are convinced that the simultaneous consideration rule is compelled either by statute or constitutional provision, we will decline to apply it simply as a matter of judicial common law. Therefore, we overrule *Graham* and hold a district court is not required to instruct a jury to consider a lesser included homicide offense simultaneously with any greater homicide offense.

Of course, "[w]e do not overrule precedent lightly and must give full consideration to the doctrine of stare decisis." *State v. Sherman*, 305 Kan. 88, 107, 378 P.3d 1060 (2016). This doctrine recognizes that "[o]nce a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in

21

subsequent cases when the same legal issue is raised." 305 Kan. 88, Syl. ¶ 2. We depart from stare decisis only when we are clearly convinced that the rule "was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." 305 Kan. 88, Syl. ¶ 3.

Yet "[*s*]*tare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.'" *Payne v. Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991); see *State v. Jordan*, 303 Kan. 1017, 1021, 370 P.3d 417 (2016) (stare decisis "is not a rigid inevitability but a prudent governor on the pace of legal change"). Stare decisis is especially compelling when reliance interests are involved. See *Sherman*, 305 Kan. at 108; *McCullough v. Wilson*, 308 Kan. 1025, 1036, 426 P.3d 494 (2018) (""Considerations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved.""). But the *Graham* rule does not check that box. And we are not constrained to follow precedent when "governing decisions are unworkable or are badly reasoned." *Payne*, 501 U.S. at 827. Thus, we are clearly convinced by subsequent experience that the simultaneous consideration rule is unworkable when imposed simply as a matter of judicial policymaking.

Concluding, as we have, that the simultaneous consideration rule is unworkable, we nevertheless address Sims' underlying claim that in this case he was denied his due process right to present his theory of defense to the jury, thus depriving him of the opportunity to be convicted of voluntary manslaughter. In doing so, as Sims points out, we note the jury was first instructed:

"Premeditation means to have thought the matter over beforehand. In other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

But after the elements instructions on each of the homicide offenses, the district court then instructed the jury on self-defense and told it:

"The offense of first-degree murder, which the defendant, Sherrick A. Sims, is charged, includes the lesser offense of intentional second-degree murder, the lesser offense of reckless second-degree murder, and the lesser offense of voluntary manslaughter. You may find the defendant, Sherrick A. Sims, guilty of first-degree murder, intentional second-degree murder, reckless second-degree murder, voluntary manslaughter, or not guilty.

"When there is a reasonable doubt as to which of the four offenses the defendant, Sherrick A. Sims is guilty, he may be convicted of the lesser offense only. Your presiding juror should mark the appropriate verdict."

This undermines the construction Sims places on the ordering language. The district court explained the elements of each offense, explained Sims' defense, and then told the jury to select the outcome for the homicide consistent with its view of the evidence.

We do not review jury instructions in isolation; we consider all the instructions together as a whole. And "'[i]f the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous.'" *State v. Sisson*, 302 Kan. 123, 130, 351 P.3d 1235 (2015).

23

When viewed with the remaining instructions, the challenged language did not prevent the jury from considering whether Sims' belief that deadly force was necessary rendered him guilty of voluntary manslaughter instead of first-degree murder. By instructing as it did, the trial court ensured the jury would consider all the offenses and select the appropriate verdict. The instructions were legally appropriate.

PRIOR FELONY LIMITING INSTRUCTION

Sims' final claim of error on appeal centers on the district judge's failure to give the jury a K.S.A. 60-455 limiting instruction on the evidence in Sims' stipulation to a prior felony conviction. Sims did not seek such instruction at trial. He now argues the lack of an instruction telling the jury it could employ the stipulation only to satisfy the elements of criminal possession of a firearm was clear error.

K.S.A. 2017 Supp. 60-455 generally protects defendants against introduction of evidence of a prior crime solely to show propensity in homicide cases not involving a sex crime. And, when such evidence is admitted for other purposes, a limiting instruction is required. See *State v. Barber*, 302 Kan. 367, 376, 353 P.3d 1108 (2015).

The State argues that K.S.A. 2017 Supp. 60-455 does not apply because it only limits evidence of a prior crime on a "specified occasion." In its view, "by stipulating to the prior felony, no evidence of a crime on a specified occasion was presented to the jury."

We reject the State's argument, but we note that this court's precedent also has treated stipulations to previous convictions as outside the ambit of K.S.A. 60-455. See, e.g., *State v. Banks*, 260 Kan. 918, 927 P.2d 456 (1996) (where proof of a previous

24

conviction is an essential element of a charged crime, failure to give a limiting instruction is not reversible in the absence of a request). These decisions predate our opinion in *State v. Gunby*, 282 Kan. 39, 49, 144 P.3d 647 (2006), in which we held that the "lines of cases allowing admission of [evidence of other crimes and civil wrongs] independent of K.S.A. 60-455 are contrary to long-held common law and the text of the statute itself."

Assuming for purposes of argument that *Gunby* would change our treatment of stipulations to prior crimes, bringing them under K.S.A. 2017 Supp. 60-455 and its requirements of a limiting instruction, Sims has not firmly convinced us that the jury would have reached a different result, if given such an instruction here. The weight of the evidence of Sims' guilt of first-degree premeditated murder was strong. The stipulation merely told the jury that Sims had a prior felony conviction. It did not specify the crime of conviction; it did not detail the circumstances surrounding that crime. Its impact was minimal.

CUMULATIVE ERROR

Finally, Sims alleges that cumulative error deprived him of a fair trial.

> "'Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. [Citations omitted.]'" *State v. Carter*, 305 Kan. 139, 166, 380 P.3d 189 (2016).

We agree with Sims that the State's witnesses violated the district court's orders in limine but hold the judge did not abuse his discretion in denying a mistrial on those grounds. We also assume that the failure to give a K.S.A. 60-455 limiting instruction for

25

the stipulation to the prior felony was erroneous but hold it was not clearly erroneous. Taken together, these errors in no way compounded one another; they were discrete. Moreover, the State's case was strong and Sims' credibility effectively challenged. On the record before us, the totality of the circumstances did not prejudice Sims or deprive him of a fair trial.

CONCLUSION

We affirm the judgment of the district court.

* * *

BEIER, J., concurring:  I concur in the result reached by the majority in this case and in its rationale on all but one issue. I differ on its reasoning regarding sequential and simultaneous jury consideration of degrees of homicide.

I agree with the majority that *State v. Bell*, 280 Kan. 358, 121 P.3d 972 (2005), and cases that have followed it are infected with a logical fallacy and would overrule them.

I would not, however, reach out to overrule *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003). Although we may not previously have identified due process as the source of a defendant's right to have lesser included offense considered simultaneously with a charged greater offense, there is nothing preventing us from doing so at the defendant's suggestion today. And we have certainly held in a variety of other situations that a defendant has a due process right to present and have his or her theory of defense effectively considered by a jury. See *State v. Jones*, 287 Kan. 547, 557, 198 P.3d 756 (2008) (analyzing whether jury instructions adequately protected defendant's "due

26

process right to present—and obtain a verdict consistent with—his theory of defense"); see also *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014) ("A defendant has a right to present his or her theory of defense, but that right is subject to some constraints."); *State v. Suter*, 296 Kan. 137, 143, 290 P.3d 620 (2012) (right to present witnesses to establish defense); *State v. Walters*, 284 Kan. 1, 16, 159 P.3d 174 (2007) (exclusion of evidence integral to theory of defense may violate fundamental right to fair trial); *State v. Rowell*, 256 Kan. 200, 209, 883 P.2d 1184 (1994), *abrogated on other grounds by State v. Shadden*, 290 Kan. 803, 235 P.3d 436 (2010) (right to present theory of defense "absolute").

That is all and exactly what Sims is arguing for here. Although imperfect self-defense involuntary manslaughter would not fully excuse Sims' killing of Alarcon-Quintana, it would lessen the degree of the homicide and, most important, it was Sims' theory of defense. I still believe that sequential consideration does not ensure that a jury ever reaches, much less effectively considers, such a theory. As the majority candidly admits, other courts have reached a similar conclusion, ruling that a failure to provide for simultaneous consideration led to a violation of a defendant's due process rights. See slip op. at 20 (collecting cases). Like those courts, I have faith that juries have both the power and the ability to consider a lesser included offense at the same time they consider a greater offense, if that is what is required to ensure protection of the defendant's constitutional due process right.

Because I would hold that the ordering language in the instructions was erroneous, I would also need to decide whether that error required reversal, either standing alone or because it altered the majority's analysis under the cumulative error doctrine.

Despite *Graham*'s suggestion that this type of error would qualify as clear in most cases, see 275 Kan. at 837, this court has since articulated the clearly erroneous test as whether the reviewing court is firmly convinced that the jury would have rendered a different verdict had the instruction error not occurred. See *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012). Sims cannot meet this standard. It was undisputed at trial that he walked up to Alarcon-Quintana; asked for money; and, after a brief, calm exchange between the two, was handed a gun, which he used to kill Alarcon-Quintana. The only material difference between Sims' version of events leading to the shooting and those of other witnesses was Sims' claim that he believed Alarcon-Quintana was reaching for a gun. That single assertion—particularly when considered in light of the jury's superior vantage point for judging the credibility of Rivas' testimony that Sims lowered his hand for the gun and then cocked it and took aim and Treat's testimony about Sims' bragging after the shooting—does not firmly convince me that the jury would have reached a different verdict had it considered first-degree premeditated murder, second-degree intentional murder, and voluntary manslaughter simultaneously.

I also would not hold that the additional error I would recognize alters the majority's outcome under the cumulative error doctrine. The sequential instruction error did not compound any other error assumed or identified by the majority.

LUCKERT and JOHNSON, JJ., join the foregoing concurring opinion.

28