Malone, J., dissenting:
This is an extraordinary case where the combined errors by the judge, prosecutor, and defense counsel substantially prejudiced the defendant and call into question the overwhelming evidence of guilt relied upon by the majority to affirm his convictions and deny him a new trial.
In this second appeal following a Van Cleave remand, I agree with Justice Johnson that our justice system demands a new trial for the defendant, one free of the numerous serious errors and conflicts that permeated his first trial. Also, I adopt Justice Rosen's well-reasoned dissent in the original appellate decision State v. Moyer , 306 Kan. 342, 385-90, 410 P.3d 71 (2017) (Rosen, J., dissenting) ( Moyer I ), in support of my conclusion that the judge's conflict led the way in substantially prejudicing the defendant in this case by denying him a fair trial.
As I was not a member of the Moyer I court, I am compelled to focus on the most egregious of six errors-the judicial conflict of interest-which infected the trial with unfairness from voir dire to verdict. The judge's conflict was clear and conspicuous to all involved, including members of the jury. His son was an endorsed law enforcement witness for the prosecution prior to the arrest of the defendant. The judge signed the arrest warrant that his son then executed by arresting the defendant. Nevertheless, the Moyer I majority held the judge's continued handling of the case was not grounds for reversal. 306 Kan. at 369-76, 410 P.3d 71. For reasons detailed in this dissent, this holding essentially lowers the standard of judicial conflict *847 (and cumulative error) to a level of nonexistence.
A closer look at the material facts, neither fully developed nor addressed in Moyer I , is necessary to illustrate both the judge's substantial conflict and how that conflict denied Moyer a fair trial.
The judge's son, Jason Showalter, worked as a deputy for the Sherman County Sheriff. As common with most sparsely populated counties, the sheriff employs only a handful of deputies. The sheriff's office, which is located in Goodland, Kansas, was the law enforcement agency that initiated the criminal investigation against the defendant, who also lived in the county seat with his family, including a daughter who is the alleged victim.
On the morning of April 9, 2009, the probable cause affidavit and Complaint/Information, naming "Deputy Jason Showalter" as the 4th of 13 witnesses for the prosecution was presented to Judge Showalter. The judge found probable cause, signed the arrest warrant, and set bond at $250,000. Thereafter, Deputy Showalter, along with another Sherman County deputy, executed the warrant and arrested the defendant in Goodland, Kansas. That same morning Judge Showalter held a first appearance for the defendant, appointed counsel, and scheduled a preliminary hearing. As the case progressed through the court, not only was Deputy Showalter listed as a witness in the original Complaint/Information, but also in the amended, the second amended, and the third amended Complaint/Information. The last being filed by the prosecution on the final day of the jury trial. Deputy Showalter was also given numerous public record notices of hearing by the Sherman County Attorney with copies sent to the Sherman County Clerk of the Court and Judge Showalter.
Obviously concerned that the judge's son being listed as a witness for the prosecution would give an "impression to the jury of favoritism," the defendant asked the judge to recuse himself. In opposing the request for a change of judge, the prosecutor indicated she would not call the judge's son as a witness in the case-in-chief; she would only call him as a witness if "[the son] would need to rebut something," but she did not anticipate "the defense needing to do that."
The judge refused to remove himself from the case. As an alternative remedy, he directed the prosecutor to "erase [my son's] involvement in this case" and ordered the parties not to mention his son's name during the trial.
In accordance with the judge's rulings, a jury was selected and the trial proceeded without his son's name ever being mentioned. The defendant was convicted and appealed.
Unless the witness endorsement only deals with a minor, nonmaterial matter, a judge should never preside over a case when his or her child is listed as a witness for either party. Canon 2, Rule 2.11(A)(2)(c) and (d) of the Kansas Code of Judicial Conduct require disqualification when the judge knows that a person with a third degree of relationship to the judge or his spouse/domestic partner is "a person who has more than a de minimis interest that could be substantially affected by the proceeding" or is "likely to be a material witness in the proceeding." 2014 Kan. Ct. R. Annot. 767-68.
A violation of this rule moves beyond an ethical violation to a constitutional due process violation when there is a likelihood that members of the jury pool are aware of this conflict. See State v. Hurd , 298 Kan. 555, 570, 316 P.3d 696 (2013) ("Recusal is required under the Fourteenth Amendment's Due Process Clause when the judge is actually biased or there is a constitutionally intolerable probability of actual bias."); State v. Sawyer , 297 Kan. 902, 909, 305 P.3d 608 (2013) (test asks "whether the judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial" and "whether the judge's failure to recuse resulted in actual bias or prejudice").
The Moyer I majority held the failure to recuse was harmless error because "where the jury was unaware that the judge's son was involved in Moyer's case, one cannot objectively declare that the probability of bias was unconstitutionally intolerable." 306 Kan. at 376, 410 P.3d 71. However, review of the voir dire transcript completely debunks this conclusion and shows the probability of *848 bias against the defendant was extremely high and pervaded the trial.
It is true the record does not explicitly show the jurors were aware of the judge's son's involvement in the case. But using this as a basis for stating "the jury was unaware that the judge's son was involved in Moyer's case" is faulty reasoning in search of a desired result. See 306 Kan. at 376, 410 P.3d 71. The judge thwarted potential questioning of the jurors on this issue by striking his son's name from the witness list. The judge effectively changed the facts of this case rather than simply recusing himself. Even without the judge ordering that everyone pretend his son was not involved in the case, elementary trial practice explains why defense counsel would have avoided asking potential jurors about the judge's son. By remaining on the case, the judge placed defense counsel in an untenable position when questioning the jury rendering the voir dire inadequate, incomplete, and ineffective.
With the judge's continued presence in the case and/or his ban on speaking his son's name, there can be little doubt the voir dire was inherently defective. However, the potential jurors' comments during jury selection demonstrate beyond any doubt the high probability the jury knew both the judge's son and his involvement in the case.
The jury selection illuminates the small, close-knit community where this crime was charged. The voir dire questions and answers were replete with venireperson knowing each other, knowing law enforcement and other witnesses to be called by the prosecution, and knowing those involved in the local court system. In addition, many venireperson were related to, friends with, or worked with others called for the same trial. A large number of the jury pool personally knew the sheriff. One potential juror indicated a friendship with "local judges and sheriffs" but stated she would be fair and impartial. Defense counsel accepted the juror with simply an "[o]kay." To which the judge added, "Evidently being my aunt isn't good enough." The venireperson replied using the judge's first name, "I tried, Scott."
At another time during voir dire, the following colloquy took place between defense counsel and another potential juror with the judge interjecting another comment of familiarity:
"MR. MASON: Okay. I do have to say I did learn something new out of reading these questionnaires. I didn't know you came from Goddard, [first name of venireperson], I thought you'd been [in Goodland] forever.
"THE COURT: The better question is, can we make her go back?
"[VENIREPERSON]: Thank you, Scott."
Again, Scott is Judge Showalter's first name.
Given this small town or community familiarity coupled with the judge's order that his son's name not be mentioned during voir dire, it is baffling how the Moyer I majority could hold, "The probability of prejudice or bias that Moyer claims was intolerably high was actually zero percent with this jury, given that it was unaware of any facts that might lead to such a perception." 306 Kan. at 375, 410 P.3d 71.
Even before the trial began, the significance of this community familiarity with the details of the case was acknowledged by the judge when he explained why he was denying defendant's motion for change of venue. Commenting on the lack of community ties the defendant and his family had, the judge stated:
"It would seem to me that based upon two factors I think are important. First of all, it is my understanding that the Moyers [the defendant and his family] are not long-term residents to the community and they do not have a substantial base of people that know them nor [sic ] their predicament based upon the charges."
The judge, who had lived in the small community for over 25 years, would have been well-served to apply the same "long-term residents" analysis to defendant's motion for change of judge. If no one knew the Moyer family or "their predicament" because they had not lived in Goodland very long, then presumably the numerous Sherman County citizens comprising the jury pool knew the judge's son would have investigated the case and was an endorsed witness for the *849 prosecution. This presumption appears highly probable upon review of the questions and answers given during voir dire and the fact the attorneys could not, both by judge's order and by common sense, ask questions about the venirepersons' knowledge of the judge's son.
Unfortunately, the judge did not seem to appreciate the problem he was creating with his son being a potential witness in a trial he was presiding over. In denying the motion for a change of judge, the judge disclosed:
"[I]t may have appeared to be some type of favorable involvement but I'm not sure that it would have been. If anything, I think I would have expected [my son] to perform at a higher level than maybe as required statutorily."
As Justice Rosen stated in his dissenting opinion in Moyer I , it was not the son's involvement that caused the problem, it was the judge's involvement. 306 Kan. at 386, 410 P.3d 71 (Rosen, J., dissenting). And his involvement could have been easily rectified by another judge handling the case, one not the father of an endorsed prosecution witness.
The foundation of our judicial system is to provide fair and impartial courts. Our democracy is built on the rule of law and justice delivered by these fair and impartial courts, not only in appearance but in practice. Here, the judge was ethically conflicted, and a high probability exists that members of the jury knew of the conflicting roles between son and father. This is not acceptable in a country where every citizen has the right to be tried by judges and juries that are unbiased and impartial.
I recognize that a majority of this court has already held that the judicial conflict was not in and of itself reversible error in Moyer I , where four other significant trial errors were found. Now in Moyer II , we have added another conflict with defense counsel, who was also guardian ad litem to a minor who would testify that the alleged victim admitted the criminal claim was not true. Defense counsel never called the minor, his other client, to give the exculpatory testimony. Yet even with this sixth error, the majority refuses to grant a new trial based on cumulative error.
" ' "Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. [Citations omitted.]" ' State v. Carter , 305 Kan. 139, 166, 380 P.3d 189 (2016)." State v. Sims , 308 Kan. 1488, 1506, 431 P.3d 288 (2018).
"If any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt. In making the assessment of whether the cumulative errors are harmless, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." State v. Williams , 308 Kan. 1440, Syl. ¶ 9, 430 P.3d 448 (2018).
With the character and the number of errors in this case, it is disingenuous for the Moyer II majority to say the verdict would have been the same because the evidence was strong. While we have stated no prejudicial error may arise under the cumulative error doctrine in a case of overwhelming evidence, to what extent should this principle be carried? In the face of overwhelming evidence, it would seem no error would be enough to warrant a new trial, and the term "right to a fair trial" becomes nothing more than window dressing and the actual trial becomes nothing more than a pretext to convict. Indeed, this court has observed that the strength of the evidence should not become the primary focus when applying a constitutional harmless error standard in prosecutorial error cases:
"Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden-i.e. , shown that there is no reasonable possibility that the error contributed *850 to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.' United States v. Socony-Vacuum Oil Co. , 310 U.S. 150, 240, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)." State v. Sherman , 305 Kan. 88, 111, 378 P.3d 1060 (2016).
I strongly disagree with the holding of the majority that the serious errors in this case did not impact this jury, especially with the vast amount of prejudice from the judicial conflict affecting the jury selection and defense counsel's conflict resulting in the exclusion of an exculpatory witness. In addition to having a jury of dubious fairness and impartiality, these conflicts in essence changed the quantum of evidence itself through the exclusion of witnesses, limitation of questions, and exclusion of exculpatory evidence. The evidence was indeed strong, but the character of the errors negate this court's finding that the verdict would have been the same without them. To not grant the defendant a new trial is affirming a conviction that is fraught with conflict, partiality, and unfairness.
For these reasons I would reverse and grant a new trial before a different judge.